**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| EMPIRE TECHNOLOGY DEVELOPMENT LLC | ) ) ) | |
| Plaintiff, | ) ) | C.A. No. _____ |
| v. | ) ) | **DEMAND FOR JURY TRIAL** |
| TEXAS INSTRUMENTS INCORPORATED | ) ) ) | |
| Defendant. | ) | |

### COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Empire Technology Development LLC ("Empire") brings this action and makes the following allegations of patent infringement of U.S Patent Nos. 9,189,448 (the "'448 Patent") and 8,180,963 (the "'963 Patent") (collectively, "patents-in-suit") against Defendant Texas Instruments Incorporated ("TI") as follows:

### THE PARTIES

1.      Empire is a limited liability company organized and existing under the laws of the state of Delaware.

2.      Empire was founded in 2008 and owns a portfolio of patent assets created and developed by an affiliate.

3.      TI is a corporation organized under the laws of Delaware, with a principal place of business at 12500 TI Boulevard, Dallas, Texas 75243.  TI may be served with process through its registered agent CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

4.     TI is a global semiconductor company that designs, manufactures, and provides to the United States and other markets a wide variety of semiconductors, including an extensive array of analog and embedded semiconductor products.

## JURISDICTION AND VENUE

5.     This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq*.  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because this is a civil action arising under the Patent Act.

6.     TI is subject to this Court's general and specific personal jurisdiction pursuant to due process and/or the Texas Long Arm Statute, due to its substantial and pervasive business in this State and District, including its infringing activities alleged herein, from which TI derives substantial revenue from goods sold to residents and consumers.

7.     This Court has general personal jurisdiction over TI at least because TI is a resident of Texas as defined by Texas law and because of TI's continuous and systemic contacts with the State of Texas such that TI is essentially at home in the forum.  TI is headquartered in the State of Texas, and TI has conducted and continues to regularly conduct and solicit business within the State of Texas and within this District.

8.     TI is also subject to this Court's specific personal jurisdiction at least because TI has committed acts within the State of Texas and this District giving rise to this action and has established sufficient minimum contacts with the State of Texas and this District such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.  TI has purposefully and voluntarily availed itself of the privileges of conducting business in the United States, in the State of Texas, and in the Eastern District of Texas by continuously and systematically placing goods into the stream of commerce through an established distribution channel with the expectation that they will be purchased by consumers in the United States and in

the Eastern District of Texas.  TI is registered to do business within the State of Texas and maintains an agent for service of process in Texas.  TI, directly and through subsidiaries, intermediaries, and third parties, has also committed and continues to commit acts of infringement in this District by, among other things, making, using, offering to sell, selling, and importing products that infringe the patents-in-suit, as alleged herein.  Empire's causes of action arise directly from TI's business contacts and other activities in the State of Texas and this District.

9.    Venue is proper as to TI under 28 U.S.C. § 1400(b) because it has committed acts of infringement in this District and has regular and established places of business within this District.  On information and belief, TI has additional business locations in this District at 6412 S. U.S. Highway 75, Sherman, Texas 75090 and 2501 S. State Highway 121 Bus., Lewisville, Texas 75067.[1]

10.    In prior unrelated civil actions, TI has not disputed this District's personal jurisdiction over it in other recent patent infringement actions, nor has TI disputed that venue is proper as to it in the Eastern District of Texas.[2]

11.    TI has committed acts of infringement in this District by commercializing, marketing, selling, distributing, testing, and servicing the infringing products described herein.

---

[1] *See, e.g.*, Defendant Texas Instruments Incorporated's Answer and Counterclaims to Plaintiff's Complaint for Patent Infringement, *MIMO Rsch., LLC v. Tex. Instruments Inc.*, No. 5:22-cv-00083 (E.D. Tex. Sept. 6, 2022), Dkt. No. 9 ¶ 5.

[2] *See, e.g.*, Defendant Texas Instruments Incorporated's Answer and Counterclaims to Plaintiff's Complaint for Patent Infringement, *MIMO Rsch., LLC v. Tex. Instruments Inc.*, No. 5:22-cv-00083 (E.D. Tex. Sept. 6, 2022), Dkt. No. 9 ¶¶ 7–8.

## THE ASSERTED PATENTS

12.    On November 17, 2015, the United States Patent and Trademark Office duly issued U.S. Patent No. 9,189,448, titled "ROUTING IMAGE DATA ACROSS ON-CHIP NETWORKS."  A true and correct copy of the '448 Patent is attached hereto as Exhibit A.

13.    The '448 Patent is directed to routing image data through one or more processors via tags associated with data samples.

14.    On May 15, 2012, the United States Patent and Trademark Office duly issued U.S. Patent No. 8,180,963, titled "HIERARCHICAL READ-COMBINING LOCAL MEMORIES."  A true and correct copy of the '963 Patent is attached hereto as Exhibit B.

15.    The '963 Patent is directed to systems for managing hierarchical read-combining memory in devices with a multicore processor operably coupled to a memory controller.

## BACKGROUND OF THE ACTION

16.    Both patents-in-suit were invented by the same pair of inventors, Drs. Thomas Conte and Andrew Wolfe.

17.    The '448 Patent describes, *e.g.*, an apparatus for increasing the efficiency of processing video and image-based data by using reference-space coordinate value data tags to efficiently route data through multiple processors.  This apparatus allows for state-of-the-art computer physical simulation and animation, with widespread utility in areas such as automotive infotainment and navigation displays; virtual reality; computer gaming; industrial transport and communications; scientific simulations; and robotic motion planning.

18.    One of the many uses of the apparatus described in the '448 Patent is for a system on a chip ("SoC"), which allows for compact, energy-efficient processing.  SoCs are ubiquitous in technology such as automotive-system computing, industrial-system computing, mobile computing, smartphones, tablets, and smartwatches, to name a few.

4

19.     Similarly, the '963 Patent describes, *e.g.*, a system for increasing the efficiency of multicore processors.  Multicore processors have become a widespread—if not the preferred—architectural approach for personal computing, network processing, and digital signal processing applications and have enabled the computing capacity necessary for the AI revolution.

20.     Multicore processing allows for smaller and higher performance processors which are essential for modern computing, but the performance gains from multicore processing are limited by the processors' ability to function in parallel.  By limiting bottlenecks from multiple cores' use of memory systems through use of hierarchical read-combining memory, the system described in the '963 Patent increases multicore processing efficiency to allow for cutting-edge applications.

21.     Empire is the owner of both patents-in-suit.

## COUNT I

### (Infringement of U.S. Patent No. 9,189,448)

22.     Empire incorporates herein by reference paragraphs 1 through 21 above as if set forth in full.

23.     TI designs, manufactures, uses, sells, and/or offers for sale in the United States products which route image data across on-chip networks and infringe the '448 Patent.

24.     TI makes in the United States, uses in the United States, sells in the United States, offers for sale in the United States, and/or imports into the United States products that practice the claimed inventions of the '448 Patent, including at least the DRA78x series of SoC devices for automotive infotainment (the "'448 Patent Infringing Products").

25.     On information and belief, TI began to offer the DRA78x series of SoC devices for automotive infotainment on or about August 2016.  The DRA78x series includes the DRA780, DRA781, DRA782, DRA783, DRA784, DRA785, DRA786, DRA787, and DRA788 models.

26.     Additional '448 Patent Infringing Products include (i) the AM570x series of processors, including the AM5706 and AM5707 models; (ii) the AM571x series of processors, including the AM5718 and AM5716 models; (iii) the AM572x series of processors, including the AM5729, AM5728, and AM5726 models; (iv) the AM574x series of processors, including the AM5749, AM5748, and AM5746 models; (v) the DRA71x series of infotainment applications processors, including the DRA710, DRA712, DRA714, DRA716, and DRA718 models; (vi) the DRA72x series of infotainment applications processors, including the DRA722, DRA724, DRA725, and DRA726 models; (vii) the DRA74x series of infotainment applications processors, including the DRA746, DRA745, and DRA744 models; (viii) the DRA75x series of infotainment applications processors, including the DRA756, DRA755, DRA754, DRA752, DRA751, DRA750 models; (ix) the DRA76xP series of infotainment applications processors, including the DRA76P model; (x) the DRA77xP series of infotainment applications processors, including the DRA77P model; (xi) the DRA79x series of infotainment applications processors, including the DRA790, DRA791, DRA793, and DRA797 models; (xii) the TDA2Ex series of SoCs, including the TDA2EG model; (xiii) the TDA2x series of processors, including the TDA2SX, TDA2SG, TDA2SA, TDA2HG, TDA2HV, TDA2HF, and TDA2LF models; (xiv) the TDA3x series of processors, including the TDA3MV, TDA3MA, TDA3MD, TDA3LX, and TDA3LA models; (xv) the TMS320DM8127 video processor; and (xvi) the TMS320DM814x series of processors, including the TMS320DM8148 and TMS320DM8147 models.

27.     The '448 Patent Infringing Products route image data across on-chip networks, include all elements of at least one claim of the '448 Patent, and thus infringe the '448 Patent.

28.     TI has infringed and continues to infringe the '448 Patent, including at least claim 1 of the '448 Patent, pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by making, using, offering to sell, selling, exporting from, and/or importing into the United States the '448 Patent Infringing Products, without authority or license.

29.     TI indirectly infringes the '448 Patent, including at least claim 1 of the '448 Patent, pursuant to 35 U.S.C. § 271(b), by and with (among other things) specific intent or willful blindness, actively aiding and abetting infringement by others, such as TI's customers and end-users, in this District and elsewhere in the United States.  For example, TI's customers and end-users directly infringe through their use of the inventions claimed in the '448 Patent.  TI induces this direct infringement through its affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the '448 Patent Infringing Products, and providing instructions, documentation, and other information to customers and end-users, instructing them to use the '448 Patent Infringing Products in an infringing manner, including (i) technical documentation such as product manuals, (ii) hardware development tools, (iii) software development tools, and (iv) design and simulation tools, all enabling customers and end-users to use the '448 Patent Infringing Products in an infringing manner.  As a result of TI's inducement, TI's customers and end-users use the '448 Patent Infringing Products in the way that TI intends and that directly infringes the '448 Patent.  TI has known of the '448 Patent and that the '448 Patent Infringing Products infringe the '448 Patent, or has been willfully blind to such infringement, since at least February 2020. Despite this knowledge of the '448 Patent and that the '448 Patent Infringing Products infringe the

'448 Patent, TI has continued to perform these affirmative acts with the intent, or willful blindness, that the induced acts directly infringe the '448 Patent.

30.    TI also indirectly infringes the '448 Patent, including at least claim 1 of the '448 Patent, pursuant to 35 U.S.C. § 271(c), by contributing to the direct infringement committed by others, such as customers and end-users, in this District and elsewhere in the United States.  TI's affirmative acts of selling and offering to sell, in this District and elsewhere in the United States, the '448 Patent Infringing Products and causing the '448 Patent Infringing Products to be manufactured, used, sold, and offered for sale, contribute to TI's customers' and end-users' use of the '448 Patent Infringing Products, such that the '448 Patent is directly infringed.  The '448 Patent Infringing Products are a material part of the invention of the '448 Patent, are not a staple article or commodity of commerce, have no substantial non-infringing use, and are known by TI to be especially made or adapted for use in the infringement of the '448 Patent.

31.    Claim 1 of the '448 Patent is reproduced below with the addition of labels [a], [b], [c], [d], and [e] corresponding to portions of the claim.

1.  An apparatus that is arranged to process image data, the apparatus comprising:

[a]    a plurality of processors; and

[b]    a plurality of switches arranged in a network,

[c]    wherein the network is arranged to use the switches to selectively route data samples through the network to one or more of the plurality of processors based on tags associated with the data samples,

[d]    wherein each tag includes at least one reference-space coordinate value of a reference space that is spatially transformed from an image space,

the data samples each represents a different portion of the reference space, and each of the plurality of processors is assigned to one or more of the different portions of the reference space, and

[e]    wherein each data sample is self-routed through the network by use of a self-routing process in which the switches are programmed with a set of distribution rules that map reference-space coordinate values, contained in the tags of the data samples, to the plurality of processors, and wherein the network is arranged to use the switches to modify routing of the data samples based on time-dependent changes, including at least one of: predicted changes in the reference space, and changes in the reference space that have skewed a distribution of computational workload among the plurality of processors.

32.    The '448 Patent Infringing Products embody each and every limitation of at least claim 1 of the '448 Patent, literally or under the doctrine of equivalents, as described in the non-limiting examples set forth below concerning, *inter alia*, the DRA78x Infotainment Applications Processor series sold by TI.  These non-limiting examples are preliminary and are not intended to limit Empire's right to modify these non-limiting examples or allege that other aspects of TI's products, or other of TI's SoCs or other products, infringe the identified claim, or any other claims, of the '448 Patent.

**"1.    An apparatus that is arranged to process image data, the apparatus comprising:"**

33.    Although the preamble is not limiting, the '448 Patent Infringing Products are products sold by TI that are arranged to process image data.

34.     For example, the DRA78x Infotainment Applications Processor series are SoCs for automotive infotainment which TI describes as having "[v]ideo and image processing support" including a video input port module with "[s]upport for up to 4 multiplexed input ports." https://www.ti.com/lit/ds/symlink/dra783.pdf at 1.

35.     Additionally, every iteration of the DRA78x Infotainment Applications Processor series contains a "Dual Arm Cortex-M4 Image Processing Unit (IPU)."  *Id.* at 7.

### "[a]    a plurality of processors; and"

36.     The '448 Patent Infringing Products include at least two processors.

37.     For example, the DRA78x Infotainment Applications Processor series have an image processing unit ("IPU") which contains two Arm® Cortex™-M4 cores, as well as "two identical instances (DSP1 and DSP2) of a digital signal processor (DSP) subsystem, based on the TI's standard TMS320C66x DSP CorePac core."  *Id.* at 183.

### "[b]    a plurality of switches arranged in a network,"

38.     The '448 Patent Infringing Products include a plurality of switches arranged in a network.   In the '448 Patent, the switches may be a non-blocking router that a core uses to communicate with other cores.   Ex. A, '448 Patent at 2:64-67.

39.     For example, the DRA78x Infotainment Applications Processor series have a plurality of switches arranged in a network, as demonstrated by the interconnect in the block diagram excerpted below:



**Figure 1-1. DRA78x Block Diagram**

https://www.ti.com/lit/ds/symlink/dra783.pdf at 3.

40.     As another example, additional technical documentation for the DRA78x Infotainment Applications Processor series also show various interconnects, all representing a plurality of switches arranged in a network.



Figure 4-1. DSP Subsystem Highlight

NOTE: (1) : This diagram shows a single DSP instance. Each device may have **one or two identical DSP instances**, refer to corresponding *device Data Manual* for the specific device support.

https://www.ti.com/lit/ug/spruif4d/spruif4d.pdf at 1309.

41.    Further, the DRA78x Infotainment Applications Processor series feature direct memory access ("DMA"), which requests mapping to enhanced digital memory access ("EDMA") channels and EDMA traffic routing.  *Id.* at 1320 ("DMA requests mapping to EDMA channels and EDMA traffic routing.").  This process further confirms a plurality of switches arranged in a network.

**"[c]    wherein the network is arranged to use the switches to selectively route data samples through the network to one or more of the plurality of processors based on tags associated with the data samples,"**

42.    The '448 Patent Infringing Products include a network arranged to use the switches to selectively route data samples through the network to one or more of the plurality of processors based on tags associated with the data samples.  *See, e.g.*, *supra* ¶¶ 38-41; *infra* ¶¶ 46-53.

43.    Additionally, the DRA78x Infotainment Applications Processor series use line multiplexing, which uses tags containing reference-space values:

**7.4.5.8.5  Super Frame Concept in Line Multiplexing**

Different camera sources are interleaved on a line-by-line basis. The beginning of each line carries a Metadata tag that provides key information about that line. This Metadata tag is preceded by a SAV codeword in which F=0, V=0, and H=0.

https://www.ti.com/lit/ug/spruif4d/spruif4d.pdf at 1892.

44.    These metadata tags necessarily carry at least one reference-space coordinate value (*i.e.*, location within a frame of a particular camera source) of a reference space that is spatially transformed from an image space (*i.e.*, a frame captured by a particular camera).  Because the Start of Active Video ("SAV") codeword precedes the metadata tag, the metadata tag identifies at least one reference-space coordinate value in order to identify the line in the camera frame.

45.    Line multiplexing in the DRA78x Infotainment Applications Processor series uses data tags with at least one reference-space coordinate value in order to multiplex data from different sources and video format standards, where each source may have a different width and height.  *Id.* ("The width and height of each source in Line Multiplexed data can be different.  For instance, one source can be PAL while another one can be NTSC.  A line is comprised of YUV422 pixels in repeating patterns of CbYCrY.").

**"[d]    wherein each tag includes at least one reference-space coordinate value of a reference space that is spatially transformed from an image space, the data samples each represents a different portion of the reference space, and each of the plurality of processors is assigned to one or more of the different portions of the reference space, and"**

46.    The '448 Patent Infringing Products include a network arranged to use the switches to selectively route data samples through the network to one or more of the plurality of processors based on tags associated with the data samples, wherein each tag includes at least one reference-space coordinate value of a reference space that is spatially transformed from an image space, the data samples each represent a different portion of the reference space, and each of the plurality of processors is assigned to one or more of the different portions of the reference space. *See supra* ¶¶ 42-45.

47.    The above-discussed line multiplexing functionality—among other functionality of the '448 Patent Infringing Products—satisfies this limitation.  For example, the DRA78x Infotainment Applications Processor series' line multiplexing functionality works by a process, where "[a]t the end of the line, an EAV code is inserted with an appropriate number of padding pixels following it.  This EAV code has F=0, V=0, and H=1.  The startcodes used for the Metadata wrapped lines and the dummy lines form the Super Frame.  The VIP_PARSER module has logic to parse out the super frame, analyze the Metadata tags, and frame buffer the line contents appropriately."  https://www.ti.com/lit/ug/spruif4d/spruif4d.pdf at 1893.

48.    As another example of infringement, the DRA78x Infotainment Applications Processor series have functionality for 2-way multiplexing of camera sources, which operates by a process in which "[t]he sync codeword, FF-00-00-XY, is replicated in both source streams.  In

2-Way Multiplexing, the sizes of both camera sources must be the same.  Likewise, the Vertical Ancillary Data [*i.e.*, a region] size for both sources must be identical.  However, the two streams are not necessarily sending the same pixel site in adjacent clock cycles."  *Id.* at 1891.

49.    Further, technical documentation for the metadata layout of the DRA78x Infotainment Applications Processor series shows that the beginning of period ("BOP") "tags the line as a startline in a period . . . defined as the contiguous lines in a vertical blanking period or the contiguous lines in a field or frame."  https://www.ti.com/lit/ug/spruhi7a/spruhi7a.pdf at 164.

50.    Each of the plurality of DSP subsystems (each of which includes a processor), and, on information and belief, the Embedded Vision Engine ("EVE"), is available and designed to be assigned to one or more of the different portions of the reference space.

51.    In addition, the EVE in the DRA78x Infotainment Applications Processor's Vision Accelerator is a programmable imaging and vision processing engine intended for use in devices that serve customer electronics imaging and vision applications.  As demonstrated in the memory map for the EVE excerpted below, the EVE receives data for processing based on cache tags:

**Table 2-10. EVE Memory Map**

| Region name | Start_Address (hex) | End_Address (hex) | Size | Description |
|---|---|---|---|---|
| L3_MAIN map | 0x0000_0000 | 0x2FFF_FFFF | 768MiB | See Table 2-1 |
| Reserved | 0x3000_0000 | 0x4001_FFFF | 384KiB | Reserved |
| EVE_DMEM | 0x4002_0000 | 0x4002_7FFF | 32KiB | EVE ARP32 data memory (DMEM) |
| Reserved | 0x4002_8000 | 0x4003_FFFF | 96KiB | Reserved |
| EVE_WBUF | 0x4004_0000 | 0x4004_7FFF | 32KiB | EVE VCOP working buffer (WBUF) |
| Reserved | 0x4004_8000 | 0x4004_FFFF | 32KiB | Reserved |
| EVE_IBUF_LA | 0x4005_0000 | 0x4005_3FFF | 16KiB | EVE image buffer low copy A (IBUFLA) |
| EVE_IBUF_HA | 0x4005_4000 | 0x4005_7FFF | 16KiB | EVE image buffer high copy A (IBUFHA) |
| Reserved | 0x4005_8000 | 0x4006_FFFF | 96KiB | Reserved |
| EVE_IBUF_LB | 0x4007_0000 | 0x4007_3FFF | 16KiB | EVE image buffer low copy B (IBUFLB) |
| EVE_IBUF_HB | 0x4007_4000 | 0x4007_7FFF | 16KiB | EVE image buffer high copy B (IBUFHB) |
| Reserved | 0x4007_8000 | 0x4007_FFFF | 32KiB | Reserved |
| EVE_SYSTEM | 0x4008_0000 | 0x4008_0FFF | 4KiB | EVE int, reset, clk, pwr, buffswc (MEMSWITCH_CTL) |
| EVE_MMU0_CFG | 0x4008_1000 | 0x4008_1FFF | 4KiB | EVE MMU0 configuration |
| EVE_MMU1_CFG | 0x4008_2000 | 0x4008_2FFF | 4KiB | EVE MMU1 configuration |
| EVE_T16C | 0x4008_3000 | 0x4008_3FFF | 4KiB | EVE T16 control |
| EVE_VCOPC | 0x4008_4000 | 0x4008_4FFF | 4KiB | EVE VCOP control |
| EVE_SCTM | 0x4008_5000 | 0x4008_5FFF | 4KiB | EVE Counter and Timer module (SCTM) |
| EVE_EDMA_TC0 | 0x4008_6000 | 0x4008_6FFF | 4KiB | EVE EDMA Transfer controller 0 (EDMA TC0) |
| EVE_EDMA_TC1 | 0x4008_7000 | 0x4008_7FFF | 4KiB | EVE EDMA Transfer controller 1 (EDMA TC1) |
| EVE_SMSET_CFG | 0x4008_8000 | 0x4008_8FFF | 4KiB | EVE SMSET configuration interface |
| EVE_SMSET_MSG | 0x4008_9000 | 0x4008_9FFF | 4KiB | EVE SMSET messaging interface |
| EVE_NoC | 0x4008_A000 | 0x4008_AFFF | 4KiB | EVE interconnect registers |
| EVE_MBX0 | 0x4008_B000 | 0x4008_BFFF | 4KiB | EVE Mailbox 0 |
| EVE_MBX1 | 0x4008_C000 | 0x4008_CFFF | 4KiB | EVE Mailbox 1 |
| EVE_MBX2 | 0x4008_D000 | 0x4008_DFFF | 4KiB | EVE Mailbox 2 |
| EVE_MBX3 | 0x4008_E000 | 0x4008_EFFF | 4KiB | EVE Mailbox 3 |
| EVE_MBX4 | 0x4008_F000 | 0x4008_FFFF | 4KiB | EVE Mailbox 4 |
| EVE_PCACHE_RAW | 0x4009_0000 | 0x4009_7FFF | 32KiB | EVE Program Cache Raw |
| EVE_PCACHE_Tags | 0x4009_8000 | 0x4009_FFFF | 32KiB | EVE Program Cache Tag |
| EVE_EDMA_CC | 0x400A_0000 | 0x400A_7FFF | 32KiB | EVE EDMA Channel Controller (EDMA CC) |
| Reserved | 0x400A_8000 | 0x402F_FFFF | 2,4MiB | Reserved |
| L3_MAIN map | 0x4030_0000 | 0xFFFF_FFFF | 3GiB | See Table 2-1 |

| Legend: | | = EVE private memory space |
|---|---|---|
| | | = Reserved memory space |

https://www.ti.com/lit/ug/spruif4d/spruif4d.pdf at 276.

52.     In addition, the EVE in the DRA78x Infotainment Applications Processor series' Vision Accelerator is a programmable imaging and vision processing engine intended for use in devices that serve customer electronics imaging and vision applications.

53.     The EVE's vector coprocessor ("VCOP"), for example, "is a SIMD engine with built-in loop control and address generation." *Id.* at 1457.  "The VCOP is programmed in array of

2D block processing level." *Id.* at 1463.  VCOP can access each of the eight banks of memory independently.  As shown in the EVE program cache architecture diagram excerpted below, the EVE receives data based on data tags.



**Figure 6-8. EVE Program Cache Architecture**

https://www.ti.com/lit/ug/spruif4d/spruif4d.pdf at 1471.

**"[e]    wherein each data sample is self-routed through the network by use of a self-routing process in which the switches are programmed with a set of distribution rules that map reference-space coordinate values, contained in the tags of the data samples, to the plurality of processors, and wherein the network is arranged to use the switches to modify routing of the data samples based on time-dependent changes, including at least one of: predicted changes in the reference space, and changes in the reference space that have skewed a distribution of computational workload among the plurality of processors."**

54.    The '448 Patent Infringing Products include a network arranged to use the switches to selectively route data samples through the network to one or more of the plurality of processors

based on tags associated with the data samples, wherein each data sample is self-routed through the network by use of a self-routing process in which the switches are programmed with a set of distribution rules that map reference-space coordinate values, contained in the tags of the data samples, to the plurality of processors, and wherein the network is arranged to use the switches to modify routing of the data samples based on time-dependent changes, including at least one of: predicted changes in the reference space, and changes in the reference space that have skewed a distribution of computational workload among the plurality of processors.

55.    For example, as discussed above, the DRA78x Infotainment Applications Processor series include a plurality of switches arranged in a network.  *See supra* ¶¶ 38-41.

56.    The interconnects (shown and mentioned, *supra* ¶¶ 38-41) are designed to be programmed with a set of distribution rules that map reference-space coordinate values to the plurality of processors.  Moreover, on information and belief, interprocessor communication (*e.g.*, between digital signal processors ("DSP"), or between a DSP and EVE) are programmed with a set of distribution rules that map reference-space coordinate values to the plurality of processors:

#### 6.1.3.10  Interprocessor Communication

This kind of communication is managed through mailboxes. The mailbox function supports 2-way communication between a maximum of four users. This function relies on internal submodules, each supporting 1-way communication between one user referred to as the sender and another user referred to as the receiver. Software allocates the mailbox submodule to the communication between two users. EVE includes internal mailbox to support synchronization and messages passing between EVE-, ARP32-, and system-level hosts.

https://www.ti.com/lit/ug/spruif4d/spruif4d.pdf at 1489; *see also generally id.* at 3800-36 (Mailbox module descriptions and functionality).

57.    Furthermore, the interconnects and processors connected thereto are designed to be programmed to modify routing of the data samples based on time-dependent changes, including at least one of (i) predicted changes in the reference space, and (ii) changes in the reference space that have skewed a distribution of computational workload among the plurality of processors.  The

patent explains that this generally concerns retagging data based on changed circumstances. As one example in the '448 Patent Infringing Products, a change in the SAV (Start of Active Video) codeword, which signals the beginning of the active video data in a video frame and thus helps to sync data so it is accurately interpreted or displayed, will cause retagging because the beginning of the line will necessarily be different. *See id.* at 1892 ("Different camera sources are interleaved on a line-by-line basis. The beginning of each line carries a Metadata tag that provides key information about that line. This Metadata tag is preceded by a SAV codeword . . . ."). As another example, loss of data from a particular camera source will cause retagging.

58.     TI's infringement is willful, as TI had actual knowledge of the '448 Patent since at least February 25, 2020, when Empire's agent contacted TI about a portfolio of patents including the '448 Patent.

59.     On or about February 25, 2020, Steve Steger sent an email to Cynthia Trochu at TI that attached a summary of a patent portfolio offering for sale that included the '448 Patent, a full asset list for the portfolio, and a proposed non-disclosure agreement.

60.     On or about April 16, 2020, Mr. Steger sent an email to Cynthia Trochu following up to confirm that Ms. Trochu had received the offering materials.

61.     On or about July 23, 2020, Mr. Steger sent an email to Cynthia Trochu following up and attaching an updated asset list that included the '448 Patent.

62.     At no point did TI license or otherwise obtain rights to the '448 Patent, either as a standalone asset or as one of the patents in the portfolio.

63.     Despite having actual knowledge of the '448 Patent since at least February 25, 2020, TI continues to sell '448 Patent Infringing Products, including but not limited to the DRA780

SoC processor with 500 MHz C66x DSP and 2 dual Arm Cortex-M4 for audio amplifier. *See* https://www.ti.com/product/DRA780?qgpn=dra780#order-quality.

64.     Without permission from or compensation to Empire, TI has sold—and continues to sell—very substantial numbers of '448 Patent Infringing Products in the U.S. based on the pioneering technology in the '448 Patent.

65.     To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '448 Patent. Empire has satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for the infringement of the '448 Patent.

66.     As a result of TI's infringement of the '448 Patent, Empire has suffered monetary damages and seeks recovery in an amount adequate to compensate for TI's infringement, but in no event less than a reasonable royalty for the use made of the invention by TI together with interest and costs as fixed by the Court.

## COUNT II

### (Infringement of U.S. Patent No. 8,180,963)

67.     Empire incorporates herein by reference paragraphs 1 through 66 above as if set forth in full.

68.     TI designs, manufactures, uses, sells, and/or offers for sale in the United States products with hierarchical read-combining local memories which infringe the '963 Patent.

69.     TI makes in the United States, uses in the United States, sells in the United States, offers for sale in the United States, and/or imports into the United States products that practice the claimed inventions of the '963 Patent, including at least, TI's multicore SoC products, such as those within the 66AK2G1x SoC series (the "'963 Patent Infringing Products," and together with the '448 Patent Infringing Products, the "Infringing Products").

70.     TI's infringing 66AK2G1x series include the 66AK2G12 model, as well as the following sold by TI:    66AK2G12ABY100,    66AK2G12ABY60,    66AK2G12ABYA100, 66AK2G12ABYA100E,        66AK2G12ABYA60,        66AK2G12ABYA60E,        and 66AK2G12ABYT100.

71.     Additional '963 Patent Infringing Products include (i) the 66AK2E0x series of multicore SoCs, including the 66AK2E05 model; (ii) the 66AK2Hxx series, including the 66AK2H12, 66AK2H14, and 66AK2H06 models; and (iii) the 66AK2L06 multicore SoC.

72.     TI has infringed and continues to infringe the '963 Patent, including, at minimum, claim 1 and/or claim 20 of the '963 Patent, pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by making, using, offering to sell, selling, exporting from, and/or importing into the United States the '963 Patent Infringing Products, without authority or license.

73.     TI indirectly infringes the '963 Patent, including, at minimum, claim 1 and/or claim 20 of the '963 Patent, pursuant to 35 U.S.C. § 271(b), by and with (among other things) specific intent or willful blindness, actively aiding and abetting infringement by others, such as TI's customers and end-users, in this District and elsewhere in the United States.  For example, TI's customers and end-users directly infringe through their use of the inventions claimed in the '963 Patent.  TI induces this direct infringement through its affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the '963 Patent Infringing Products, and providing instructions, documentation, and other information to customers and end-users instructing them to use the '963 Patent Infringing Products in an infringing manner, including (i) technical documentation such as product manuals, (ii) hardware development tools, (iii) software development tools, and (iv) design and simulation tools, all enabling customers and end-users to use the '963 Patent Infringing Products in an infringing manner.  As a result of TI's inducement,

TI's customers and end-users use the '963 Patent Infringing Products in the way that TI intends and that directly infringes the '963 Patent. TI has known of the '963 Patent and that the '963 Patent Infringing Products infringe the '963 Patent, or has been willfully blind to such infringement, since at least February 2020. Despite this knowledge of the '963 Patent and that the '963 Patent Infringing Products infringe the '963 Patent, TI has continued to perform these affirmative acts with the intent, or willful blindness, that the induced acts directly infringe the '963 Patent.

74.    TI also indirectly infringes the '963 Patent, including, at minimum, claim 1 and/or claim 20 of the '963 Patent, pursuant to 35 U.S.C. § 271(c), by contributing to direct infringement committed by others, such as customers and end-users, in this District and elsewhere in the United States. TI's affirmative acts of selling and offering to sell, in this District and elsewhere in the United States, the '963 Patent Infringing Products and causing the '963 Patent Infringing Products to be manufactured, used, sold, and offered for sale, contribute to TI's customers' and end-users' use of the '963 Patent Infringing Products, such that the '963 Patent is directly infringed. The '963 Patent Infringing Products are a material part of the invention of the '963 Patent, are not a staple article or commodity of commerce, have no substantial non-infringing use, and are known by TI to be especially made or adapted for use in the infringement of the '963 Patent.

75.    Claim 1 of the '963 Patent is reproduced below with the addition of labels [a], [b], [c], and [d] corresponding to portions of the claim.

1.    A system for hierarchical read-combining memory comprising:

[a]    a multicore processor operably coupled to a memory controller;

[b]    a hierarchy of one or more levels of memory; and

[c]    a plurality of memory controllers, including the memory controller operably coupled to the multicore processor;

[d]    wherein each of the plurality of memory controllers is configured to receive a plurality of requests for data from one or more processing cores of the multicore processor or from one or more memories in a first level of the hierarchy, selectively hold a request for data from the plurality of requests for an undetermined amount of time, and selectively combine a plurality of requests for the same data into a single read-combined data request for another level of the hierarchy.

76.    Claim 20 of the '963 Patent is reproduced below with the addition of labels [a], [b], [c], and [d] corresponding to portions of the claim.

20. A system for hierarchical read-combining memory comprising:

[a]    a multicore processor operably coupled to a memory controller;

[b]    a hierarchy of one or more levels of memory; and

[c]    a plurality of memory controllers, including the memory controller operably coupled to the multicore processor;

[d]    wherein each of the plurality of memory controllers is configured to receive a plurality of requests for data from one or more processing cores of the multicore processor or from one or more memories in a first level of the hierarchy, selectively hold a request for data from the plurality of requests for a predetermined amount of time, and selectively combine a plurality of requests for the same data into a single read-combined data request for another level of the hierarchy.

77.    The '963 Patent Infringing Products embody each and every limitation of at least claim 1 and/or claim 20 of the '963 Patent, literally or under the doctrine of equivalents, as described in the non-limiting examples set forth below.    These non-limiting examples are preliminary and are not intended to limit Empire's right to modify these non-limiting examples or allege that other aspects of TI's multicore SoCs or other devices infringe the identified claims, or any other claims, of the '963 Patent.

**"1. [and 20.]    A system for hierarchical read-combining memory comprising:"**

78.    Although the preamble is not limiting, the '963 Patent Infringing Products are products sold by TI with hierarchical read-combining memory systems.

79.    For example, the 66AK2G1x Multicore DSP+Arm KeyStone II System-on-Chip (the "66AK2G1x") product series are highly integrated SoC devices based on TI's Keystone II architecture that "address applications that require both DSP and Arm performance, with integration of high-speed peripheral and memory interfaces, hardware acceleration for network and cryptography functions, and high-level operating systems (HLOS) support."

https://www.ti.com/lit/ds/symlink/66ak2g12.pdf at 4.

80.    TI advertises that the 66AK2G1x series enable both the DSP and Arm core processors "to master all memory and peripherals in the system," which "facilitates maximum software flexibility where either DSP- or Arm-centric system designs can be achieved." *Id.*

81.    Further, TI advertises that the 66AK2G1x series "significantly improve[] device reliability by extensively implementing error correction code (ECC) in processor cores, shared memory, embedded memory in modules, and external memory interfaces." *Id.*

82.    A block diagram of the 66AK2G1x series showing the various memory subsystems is excerpted below:



*Id.* at 5.  The 66AK2G1x series contains an Arm® Cortex®-A15 microprocessor core with, at minimum, Level 1 ("L1") program memory, L1 data memory, and Level 2 ("L2") memory with an error correction code ("ECC"), as well as a C66x DSP core with L1 program memory, L1 data memory, and L2 data memory with an ECC.

**"[a]    a multicore processor operably coupled to a memory controller;"**

83.    The '963 Patent Infringing Products each contain a multicore processor that is operably coupled to a memory controller.

84.     For example, in the 66AK2G1x series, the Arm® Cortex®-A15 microprocessor core and C66x DSP core are coupled with a memory subsystem comprising a Multicore Shared Memory Controller ("MSMC"), up to a 36-bit DDR External Memory Interface ("DDR EMIF"), and a General-Purpose Memory Controller ("GPMC"). *Id.* at 1.

85.     The Arm Subsystem ("ARMSS") of the 66AK2G1x series "integrates a single Cortex-A15 processor with additional logic for bus protocol conversion, local power management, and various debug and trace enhancements." *Id.* at 174.  ARMSS includes 32KB L1 instruction and data caches and a 512KB L2 cache. *Id.*

86.     The C66x DSP subsystem of the 66AK2G1x series supports the Program Memory Controller (L1 program cache/static random access memory ("SRAM")), the Data Memory Controller (L1 data cache/SRAM), the Unified Memory Controller (L2 cache/SRAM), the External Memory Controller, and the Extended Memory Controller (the "XMC"). *Id.* at 175.

87.     The C66x cache subsystem contains a 1024KB L2 memory, a 32KB L1 program memory, and a 32KB L1 data memory, each of which has a unique location in the memory map. *Id.* at 176.

88.     Moreover, according to TI's Multicore Programming Guide, "[o]n the Texas Instruments TCI66xx and C6xx devices, each core has local L1/L2 memory and equal access to any shared internal and external memory."   https://www.ti.com/lit/an/sprab27b/sprab27b.pdf at 27.

**"[b]    a hierarchy of one or more levels of memory; and"**

89.     The '963 Patent Infringing Products each contain a hierarchy of one or more levels of memory.

90.    For example, the 66AK2G1x series contain processor cores that contain memory hierarchies, comprising L1 program memory, L1 data memory, and L2 unified memory. https://www.ti.com/lit/ds/symlink/66ak2g12.pdf at 1; *see supra* ¶¶ 82, 84-88.  The C66x DSP memory architecture is comprised of a "two-level internal cache-based memory architecture plus external memory."  https://www.ti.com/lit/ug/sprugy8/sprugy8.pdf at 1-13.  Level 1 memory is divided into program and data memory, and both can be configured into SRAM and cache with up to 32K bytes of cache.  *Id.*  Level 2 memory consists of unified data and program memory, and can operate as SRAM and/or cache.  *Id.*

91.    The figure below illustrates the memory hierarchies within the C66x DSP core:



*Id.*

92.     TI's Multicore Programming Guide further provides that "[e]mbedded processors typically have a memory hierarchy with multiple levels of cache and off-chip memory.  It is preferred to operate on data in cache to minimize the performance hit on the external memory interface."  https://www.ti.com/lit/an/sprab27b/sprab27b.pdf at 12.

**"[c]     a plurality of memory controllers, including the memory controller operably coupled to the multicore processor;"**

93.     The '963 Patent Infringing Products contain a plurality of memory controllers, including one that is operably coupled to the multicore processor.

94.     For example, the 66AK2G1x series contain multiple memory controllers, including the MSMC, the DDR EMIF, and the GPMC, which are operably coupled to the multicore processors, including ARMSS and DSP.  The DSP also supports a number of memory controllers, *see supra* ¶ 86, including the XMC.  The XMC is responsible for the L2 memory controller's path to the MSMC, by providing access to the shared memory.  It also provides memory protection and address extension through the MPAX unit.  https://www.ti.com/lit/ug/sprugw0c/sprugw0c.pdf at 1-4, 1-5.

95.     Essentially, "[t]he XMC (external memory controller) registers and the EMC (enhanced memory controller) registers manage the MSMC interface individually *for each core* and provide memory protection and address translation from 32 bits to 36 bits to enable various address manipulations such as accessing up to 8 GB of external memory." https://www.ti.com/lit/an/sprab27b/sprab27b.pdf at 29 (emphasis added).

**"[d]     wherein each of the plurality of memory controllers is configured to receive a plurality of requests for data from one or more processing cores of the multicore processor or from one or more memories in a first level of the hierarchy, selectively**

**hold a request for data from the plurality of requests for an undetermined [or, in Claim 20, predetermined] amount of time, and selectively combine a plurality of requests for the same data into a single read-combined data request for another level of the hierarchy."**

96.     Each of the plurality of memory controllers in the '963 Patent Infringing Products is configured to receive a plurality of requests for data from one or more processing cores of the multicore processor or from one or more memories in a first level of the hierarchy, selectively hold a request for data from the plurality of requests for an undetermined [or predetermined] amount of time, and selectively combine a plurality of requests for the same data into a single read-combined data request for another level of the hierarchy.

97.     For example, the MSMC in the 66AK2G1x series "manages traffic among the device ARMSS, DSP, DMA, other master peripherals, and the DDR EMIF controller," effectively receiving requests from one or more processing cores or from one or more memories in the first level of the hierarchy.  https://www.ti.com/lit/ds/symlink/66ak2g12.pdf at 178.

98.     Specifically, the MSMC receives requests for data from each of the ARMSS and DSP cores.  The MSMC has one 256-bit slave interface to connect to the DSP and one 256-bit slave interface to connect to the ARMSS.  https://www.ti.com/lit/ug/spruhy8i/spruhy8i.pdf at 1131.  The DSP and the ARMSS use these interfaces to access the MSMC on-chip SRAM, the external SDRAM, and the EMIF configuration registers through the MSMC EMIF Master Port or system level resources through the MSMC System Master Port.  *Id.* at 1132.  Additionally, the level 2 or level 3 shared SRAM is accessible by ARMSS, DSP, and the master peripherals.

99.     Further, according to TI's Multicore Programming Guide, "[e]ach core accesses any of the shared memories either L2 shared memory (MSM - multicore shared memory) or the

external memory DDR3 via the memory subsystem multicore (MSMC) module," with each core

having "a direct master port into the MSMC." https://www.ti.com/lit/an/sprab27b/sprab27b.pdf

at 29.

100.    A high-level view of the MSMC module, illustrating how the memory controller

receives data from the various core processors, is shown below:

**Figure 7-2. MSMC Functional Block Diagram**



https://www.ti.com/lit/ug/spruhy8i/spruhy8i.pdf at 1131.

101.    The '963 Patent also explains that "[e]ach memory controller 204 may decide to

hold any data request from the respective subset of cores for some period of time, in order to wait

for additional requests for the same chunk of data from the same core or other core or cores in the

respective subset." Ex. B, '963 Patent at 5:16-20.

102.    In the 66AK2G1x series, for example, each of the plurality of memory controllers is configured to selectively hold a request for data from the plurality of requests for an undetermined or predetermined amount of time.

103.    The 66AK2G1x series contain the C66x DSP, which supports block coherence operations.  Block coherence operations synchronize L1 program memory with the system between major events, such as a task switch, L1 program memory mode change, or change to memory protection settings.  The L1 program cache of a defined block of code that is under software control can be invalidated.  https://www.ti.com/lit/ug/sprugw0c/sprugw0c.pdf at 2-7, 2-8.

104.    On the C66x DSP, it is recommended that programs wait for block coherence operations to complete before continuing, and programs can wait for completion by issuing an MFENCE instruction, among other methods.  The MFENCE instruction, which is new to the C66x DSP, "stalls the DSP until all outstanding memory operations complete." *Id.* at 2-8.  More specifically, "[w]hen combined with a simple CPU loop, MFENCE can be used to implement a fence operation to guarantee the sequential consistency between groups of read/write accesses.  It can be used to synchronize the memory requests to a particular endpoint that may arrive by different paths.  It can also be used to make memory access occur in a particular order from all CPUs' perspective for some multiprocessor algorithm.  This simplifies the coherency protocol required for shared data sections."  https://www.ti.com/lit/wp/spry150a/spry150a.pdf at 5.

105.    As a second example, the MSMC's registers selectively hold a request.  Among other things, the MSMC bandwidth management control registers such as starvation bound registers, which would be unnecessary if requests were not being held.

### 3.4 Bandwidth Management Control Registers

#### 3.4.1 Starvation Bound Register for C66x CorePac Slave Ports (SBNDC*n*)

The SBNDC*n* is shown in Figure 3-10 and described in Table 3-11.

**Figure 3-10    Starvation Bound Register for C66x CorePac Slave Ports (SBNDC*n*)[1]**

| 31 | 24 | 23 | 16 | 15 | 8 | 7 | 0 |
|---|---|---|---|---|---|---|---|
| Reserved | | SCNTCE | | Reserved | | SCNTCM | |
| R,+0000 0000 | | RW,+0001 1111 | | R,+0000 0000 | | RW,+0001 1111 | |

Legend: R = Read only; W = Write only

1. n = 0 to N-1, where N is the number of CorePacs available in the device.

**Table 3-11    Starvation Bound Register for C66x CorePac Slave Ports (SBNDC*n*) Field Descriptions**

| Bit | Field | Description |
|---|---|---|
| 31-24 | Reserved | 0 = Reads return 0 and writes have no effect. |
| 23-16 | SCNTCE | Value = 0-FFh |
| | | Reload value (pre-scaled by 16) for the starvation counter for C66x CorePac slave n requests at the EMIF arbiter. |
| 15-8 | Reserved | 0 = Reads return 0 and writes have no effect. |
| 7-0 | SCNTCM | Value = 0-FFh |
| | | Reload value for the starvation counters for C66x CorePac slave n requests at the RAM bank arbiters. |
| **End of Table 3-11** | | |

https://www.ti.com/lit/ug/sprugw7a/sprugw7a.pdf at 3-9.

106.    Through these starvation-bound registers, a memory controller can prevent requests like memory accesses, including read requests, that are being held from being indefinitely delayed by higher-priority requests.

107.    According to TI's KeyStone Architecture MSMC User Guide, "[t]he arbitration scheme attempts to allocate accesses fairly to requestors at the same priority level. However, it is not sufficient to ensure a bound on the wait times experienced by lower priority requests. Consequently, requestors could be starved for access when there is heavy traffic at higher priority levels. To avoid indefinite starvation for lower priority requests, the MSMC features a bandwidth management scheme that limits starvation times." *Id.* at 2-11.

108.    Additionally, "[t]he MSMC features a starvation bound register (SBND) per requestor. These memory-mapped configuration registers are SBNDC0-SBNDC*n* for the C66x CorePac slaves, and SBNDM for the SMS port and SBNDE for the SES port. The registers are programmed with a desired starvation bound in MSMC cycles for the requestor's accesses." *Id.*

The products hold requests for data for any undetermined or predetermined amount of time (in this case, until higher-priority requests are filled).

109.    As a third example, the Multicore Programming Guide explains that, in the context of mapping modules, tasks, or subsystems to individual cores, "[w]hen multiple cores need to share a resource like a DMA engine or critical memory section, a hardware semaphore is used to ensure mutual exclusion" and "[t]he use of hardware accelerators like FFT or Viterbi coprocessors is common in embedded processing.  Sharing the accelerator across multiple cores would require mutual exclusion via a lock to ensure correct behavior." https://www.ti.com/lit/an/sprab27b/sprab27b.pdf at 12-13.  During "wait" periods (as opposed to "signal" periods), for example, requests for data would be held for an undetermined amount of time.

110.    Additionally, the '963 Patent provides that "[a]s requests for the same data from further processing cores increase, the requests can be read-combined into a single data request to a respective level one (L1) cache 206."  Ex. B, '963 Patent at 5:20-23.

111.    In the 66AK2G1x series, for example, each of the plurality of memory controllers is configured to selectively combine a plurality of requests for the same data into a single read-combined data request for another level of the hierarchy.  Using the MFENCE instruction, after stalling the DSP (including read requests) until all outstanding memory operations complete, MFENCE can be used to implement a fence operation to guarantee the sequential consistency between groups of read/write accesses.  More specifically, MFENCE can "be used to *synchronize the memory requests to a particular endpoint that may arrive by different paths*." https://www.ti.com/lit/wp/spry150a/spry150a.pdf at 5 (emphasis added).  "It can also be used to

make memory access occur in a particular order from all CPUs' perspective for some multiprocessor algorithm." *Id.*

112.    Moreover, TI provides the following instructions, regarding the combining of requests, to programmers writing software for the accused products:

- "**Identifying a Parallel Task Implementation** . . . Combining – Decisions made in the partitioning and communication phases are reviewed to identify a grouping that will execute efficiently on the multicore architecture."

    https://www.ti.com/lit/an/sprab27b/sprab27b.pdf at 9.

- "The combining phase determines whether it is useful to combine tasks identified by the partitioning phase, so as to provide a smaller number of tasks, each of greater size. Combining also includes determining whether it is worthwhile to replicate data or computation.  Related modules with low computational requirements and high coupling are grouped together.  Modules with high computation and high communication costs are decomposed into smaller modules with lower individual costs." *Id.* at 12.

113.    TI's infringement is willful, as TI had actual knowledge of the '963 Patent since at least February 25, 2020, when Empire's agent contacted TI about a portfolio of patents including the '963 Patent.

114.    On or about February 25, 2020, Steve Steger sent an email to Cynthia Trochu at TI that attached a summary of a patent portfolio offering for sale that included the '963 Patent, a full asset list for the portfolio, and a proposed non-disclosure agreement.

115.    On or about April 16, 2020, Mr. Steger sent an email to Cynthia Trochu following up to confirm that Ms. Trochu had received the offering materials.

116.    On or about July 23, 2020, Mr. Steger sent an email to Cynthia Trochu following up and attaching an updated asset list that included the '963 Patent.

117.    At no point did TI license or otherwise obtain rights to the '963 Patent, either as a standalone asset or as one of the patents in the portfolio.

118.    Despite having actual knowledge of the '963 Patent since at least February 25, 2020, TI continues to sell the '963 Patent Infringing Products, including but not limited to the 66AK2G12 multicore SoC device with the Arm® Cortex®-A15 microprocessor unit (Arm A15) subsystem and C66x fixed- and floating-point VLIW DSP subsystem. *See* https://www.ti.com/product/66AK2G12#order-quality.

119.    Without permission from or compensation to Empire, TI has sold—and continues to sell—very substantial numbers of '963 Patent Infringing Products in the United States based on the pioneering technology in the '963 Patent.

120.    To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '963 Patent.  Empire has satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for the infringement of the '963 Patent.

121.    As a result of TI's infringement of the '963 Patent, Empire has suffered monetary damages, and seeks recovery in an amount adequate to compensate for TI's infringement, but in no event less than a reasonable royalty for the use made of the invention by TI together with interest and costs as fixed by the Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Empire prays for a judgment in its favor and against TI and respectfully requests the following relief:

A.    A judgment in favor of Empire that TI infringed, either literally or under the doctrine of equivalents, the '448 and '963 Patents;

B.      Damages for infringement of the '448 and '963 Patents in an amount to be determined at trial;

C.      For other monetary relief, including costs, expenses, and pre- and post-judgment interest;

D.      A determination that TI's infringement of the '448 and '963 Patents has been and is willful, and an award of enhanced damages, up to and including trebling of the damages awarded to Empire under 35 U.S.C. § 284;

E.      An order pursuant to 35 U.S.C. § 283 enjoining TI, its officers, directors, agents, servants, employees, attorneys, and those persons in active concert or participation with TI, from further acts of infringement of the '448 and '963 Patents;

F.      A determination that this is an exceptional case under 35 U.S.C. § 285 and an award of attorneys' fees and costs to Empire;

G.      An order awarding Empire any such other relief as the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Empire hereby demands a jury trial as to all issues so triable.

Dated:  August 20, 2025

Respectfully submitted,

*/s/ Elizabeth L. DeRieux*
Elizabeth L. DeRieux
Texas State Bar No. 05770585
**CAPSHAW DERIEUX, LLP**
114 East Commerce Avenue
Gladewater, Texas 75647
(903) 845-5770
Email:  ederieux@capshawlaw.com

Christopher J. Gaspar (*pro hac vice* to be submitted)
Nathaniel T. Browand (*pro hac vice* to be submitted)
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001-2163
(212) 530-5000
Email:  cgaspar@milbank.com
Email:  nbrowand@milbank.com

*Attorneys for Plaintiff*
*Empire Technology Development LLC*